Good morning. I'm Glenn Sollum and I represent the plaintiff in this case, the appellant, Jean Claire Markell. The Appley defendant has argued that Ms. Markell's claim or the issue of pretext for their asserted good reason for her discharge is precluded by an arbitration that took place under the collective bargaining agreement. However, that issue was considered by the district court in a previous motion for summary judgment, and the court cited Wright v. Universal Maritime Service Corporation, 425 U.S. 70, 1998, as follows. Thus, although the Wright court expressly did not reach the question of whether a clear and unmistakable waiver of the right to a judicial forum for the Title VII claims would be enforceable, it clearly affirmed that any waiver of judicial forum rights contained in the CBA that was less than clear and unmistakable would be treated as a nullity. There was no waiver in the collective bargaining agreement applicable in this case of any federally enforceable employment rights. And therefore, there can't be any claim or issue preclusion under Wright. Okay. Let's assume that we agree with you. Nonetheless, you've got some hills to climb. That is to say, no preclusion from the arbitration. I'm sorry. I didn't hear you. No preclusion from the arbitration. Let's say we agree with you on that point. Nonetheless, you've got some hills to climb. I don't disagree. Yeah. So start climbing. The defendant also makes the point that the affiants who submitted evidence in support of Markell's claim that copying patient records was not a dischargeable offense for Kaiser were not appropriate comparators. Defendant, this is the point. The evidence presented by these people was not presented to show that they were appropriate comparators who were treated differently, but rather that because of where they were and what they did, they had the opportunity to personally observe appropriate comparators who engaged in behavior not unlike what Ms. Markell did without suffering any disciplinary consequences. There were two of them. One was a Ms. Holliday, and the other one was a Ms. Washington. On, I believe, page 24 of the defendant's brief, the defendant states that Ms. Holliday is not a similarly situated comparator because her affidavit provides no evidence that she reported to the same manager. That is not true. It's false. Her affidavit actually states that she reported to the same manager as Ms. Markell. The defendant also complains that the time periods were not specific enough. However, both the affiants named time periods that were coterminous with the time period that Ms. Markell worked under Ms. Engel. Well, aren't there more significant differences that she copied time records of patients not under her care? She took them home. She had a prior disciplinary record, which is different. Aren't those the significant differences? She did have a prior disciplinary record, but Ms. Engel testified in deposition that the reason for the termination, the straw that broke the camel's back, was her breaching confidentiality duties toward the patient. That was her testimony in deposition. I believe it was cited in the brief. Well, straw that breaks the camel's back seems that you're agreeing with Judge Jones. You're agreeing with Judge Jones that she had a history because straw that broke the camel's back sounds like, you know, there's a history and then, boom, this one really tips it over the edge. She had a prior disciplinary history with Ms. Engel, but her disciplinary record prior to Ms. Engel was clean. And the point was, however, that other people brought home patient records, including Ms. Washington, who was commended for doing it. And the argument that the Court made was that my client brought them home for a selfish purpose, not for a work-related purpose. However, her testimony was exactly the opposite. Her testimony was that she brought the records home because she had been counseled on her charting, and she wanted to compare her charting with those of other similarly situated. Did she also testify that, in addition, she wanted them in order to defend herself against the charge of improper keeping of her records? No, I don't believe so. Okay. I don't know anything about that testimony. Okay. The point being that Holiday and Washington were in a position to observe copying of charts for various purposes. Ms. Washington especially testified that she knew of two people who were younger than Markell who copied charts and who weren't disciplined. The reason this is an analytically tricky point is that I gather, for purposes of this lawsuit, that she could have been fired for pretty much any reason so long as it's not an impermissible reason. So what she's arguing is that she was fired for an impermissible reason because she was too old. So the only thing the employer has to show is that they didn't fire her for an impermissible reason. And it's a pretty strong inference that they had a permissible reason if you take the entire complex of facts. That is to say, she's being subjected to this so-called progressive discipline. She has then discovered copying patient charts, not only her own but others. And she offers this story, which the employer may or may not believe that that was the purpose as to why she was doing that. It's very clear that it's in violation of the formal policy. And the question is whether that's enough to get you to show that there's a prima facie violation. Well, there are a couple of things that I would point out. Number one, usually progressive discipline has to be meted out under the collective bargaining agreement. And absent the copying of patient records, she would not have been discharged. Number two, she can cite the Holiday Affidavit and the Washington Affidavit for purposes of showing the people who engaged in similar behavior without any disciplinary consequences. In addition to that... Excuse me, I'm sorry to interrupt. The people who copied charts but were not disciplined, do we have any showing that those others who copied charts and were not disciplined at the time of copying were under any other disciplinary proceeding or threat? Do we know? No. We don't know. I have to concede that. Okay. There was testimony from a specialist from Kaiser who stated that the records that were in question in this case did not contain very much sensitive information. The same person testified that ordinarily in the case of discipline, for progressive discipline purposes, the hygienist's prior record and her longevity and mitigating circumstances would be taken into account. And Ms. Angholm testified specifically that she did not take any mitigating circumstances into account. And I think that points up that these things were the whole disciplinary process involving the copying of patient records was pretextual because ordinarily mitigating circumstances would be taken into account. I think that's a very important point. And it's one that the defendant completely passes over. Okay. The other things that I think are important here is that this is not an ordinary disparate treatment case. Most disparate treatment cases have to do with McDonnell-Douglas standard. And in this case, although McDonnell-Douglas is the framework under which the case is being analyzed, there is also some evidence of pattern of practice in this case based on statements that were made both by Holiday and Washington to the effect that they observed that there was a pattern of Kaiser disciplining older hygienists. And the problem with reaching a conclusion in this case that disposes of it goes against the idea of having the whole record unfold before the Court and make a decision on a full and detailed record. That's part of the problem with it. I have nothing else unless you have more questions. Okay. Well, then you've got a little time, so you can use that in response. Thank you. Thank you. Thank you. May it please the Court. P.K. Runkles-Pearson for Kaiser Foundation Health Plan. And I'd like to start just by pointing out, as I think the Court has recognized, that it is undisputed here that the plaintiff violated Kaiser policy and HIPAA by taking home patient records, including patients other than hers, and that, as I'll show you the citations, she actually took them home for the purpose, for a selfish purpose, in order to contest corrective action about her charting processes. Before we get into that, do you mind if we start with the arbitration? I just read that 28J letter. Yes, Your Honor. It sounds as though you're no longer relying on the McDonald case. Tell me what your position now is with respect to a stopbook coming out of the arbitration proceeding. Certainly, Your Honor. The McDonald case actually was not a case that we relied on previously. It was not mentioned in our briefing, which is why I wanted to bring it to your attention. The McDonald case mentions that in that time, in 1983, the Court believed that some collateral estoppel effect should not come from an arbitration, and it did refer to facts. The reason why we think the McDonald case is not applicable here, although I felt I needed to bring it to your attention, is because in coming to that conclusion, it relied completely on the distrust of the arbitral forum that the Supreme Court had previously discussed in the Gardner case, and that was overruled in 14 Penn Plaza. So although I thought it was important to bring McDonald to your attention as authority that we hadn't previously brought to you, I believe that it is no longer a good law and it's been overruled by 14 Penn Plaza. Okay. Thank you. So did you have further questions about the arbitration? No, no. I just wanted to make sure I understood the consequence that you wanted us to attach to your 28-J letter. Excellent. Thank you for the question, Your Honor. So since we're on arbitration, I did want to follow up on the point that Mr. Solomon made about the Wright case. We don't think that the Wright case hurts us here because Wright involved whether or not the plaintiff had waived a forum by doing arbitration with the union, so whether or not you couldn't bring a claim, a Title VII claim at all. And we can see that the case law that Wright said, you can't bring that it's about waiver of forum, and that 14 Penn Plaza is also about waiver of forum, and that the current law on that is that you can waive an arbitral forum if you do so expressly in the collective bargaining agreement. That whole point is completely irrelevant to what we're saying about collateral estoppel here. Even though the Supreme Court spent a lot of time talking about whether or not you can get into court on Title VII, the issue we wanted to bring to your attention was issue preclusion. Here the plaintiff went through, represented by her union lawyers, a long arbitration. The arbitrator made lots of findings of fact after hearing all the witnesses live in front of him, and we believe that there's no reason in the case law that that shouldn't preclude the plaintiff here. Those findings of fact were pretty important. They included that the plaintiff's job performance was quite poor. That's a finding of fact that goes directly to whether or not she's made her prima facie case under Title VII. That the plaintiff took the information for personal reasons. That the plaintiff's actions ---- Well, I think when you look at the policy, at Kaiser's policy and at HIPAA, what both of them say is that you have to have the narrowest access to the material that's possible in order to do your job. And what Kaiser's position was is that if plaintiff had wanted to improve her charting, there were ways she could do it that didn't violate the policy. She could ask ---- But is that statement a way of saying we don't believe that you were trying to do it in order to improve? Or they're just saying, listen, if you were trying to do that, I'm sorry you didn't choose a better mechanism. That's right. The second one, Your Honor, that you didn't choose the appropriate mechanism and that choosing the inappropriate mechanism was done for selfish reasons. The plaintiff ---- Now, what do you mean? Now, I see all of a sudden selfish reasons. What's that mean? Well, plaintiff was trying to show that other people had made the same kinds of charting mistakes that she had made in order to show that what she was doing wasn't that bad. Well, wait a minute. I just think I heard from the other side that there was no such testimony. There is actually, Your Honor, and I can point that out to you. Could you, please? So first on page SER 62, in the arbitration, Ms. Engholm testified that the matter initially came to her attention when two dental assistants came forward and told them that they had seen Ms. Markell looking in patient records and that ---- Were these her patient records? I beg your pardon? They were her patients. That she was looking in the patient records and that she had photocopied patient records. We later learned, and she admitted, that she photocopied patient records that did not belong to her. And what she told ---- what Ms. Engholm learned was that she had said, and I'm pointing here on the upper right-hand corner of page 62, that she told them something along the lines of, well, they're, meaning management, trying to get me on the stakes in my charting, so I'm going to prove that other people are making mistakes in their charting. You mean upper left-hand corner, but I follow you. I beg your pardon, yes. You see where I'm at. And then later on, on SER 71 and 72, Ms. Engholm also pointed out that Ms. Markell said this directly to her as well, that she learned directly from Ms. Markell that Markell was going to use the charts in the corrective action process. Now, since we're moving away from the arbitration, let's set that aside. Assuming it doesn't collaterally stop anything here, why haven't the affidavits of the two witnesses, Holliday and Washington, whatever their weaknesses may be, why don't they suffice nonetheless to create a triable issue of fact rather than resolving this on summary judgment? I think, first of all, much of the information they're in is not admissible, and Kaiser submitted detailed objections showing that these people did not show that this was coming from their personal knowledge and that it wasn't sufficiently specific. The summary judgment standard requires plaintiffs to come forward with specific facts sufficient to rebut summary judgment. Did the district court rule on those objections? The district court did not. So what does that mean? We can assume that we're supposed to decide whether they're hearsay or not? The district court jumped directly over the objections and said that even if the evidence was admissible, it wasn't enough to create an issue of fact. All right, so taking it in that posture. So even if you take this information as admissible, Your Honor, it's not sufficiently on point to show that other people were treated differently from Ms. Markell at the same time, in the same circumstance. One important piece of information that I think may have gotten lost here is that the HIPAA policy changed dramatically in 2003. HIPAA wasn't enacted until 2003. So after that point, Kaiser started implementing new and different policies to comply with HIPAA. Ms. Markell was discharged in 2005 when those new policies were in effect. Much of the information in these declarations is completely unclear as to time. Ms. Washington and Ms. Holliday said that they worked respectively from 1988 and 1989. So a lot of this could have happened earlier. We simply don't know. So it's not enough to create an issue of fact for that reason. Even if you consider it important as to time, it's unclear throughout most of this whether or not the people actually worked for Ms. Engholm. Although Ms. Holliday did at one point work for Ms. Engholm, the evidence is that Ms. Engholm didn't start working at that dental facility until 2002, and it's not clear whether Ms. Engholm was directly involved in any of the further events in the declaration. Even after that, there are many exceptions in the Kaiser policy for copying records for job-related purposes, and it's not clear throughout most of these declarations whether or not the copying was done for job-related purposes. I just reread the two affidavits. I don't understand really what objections you're going to be making if your objection is it's not based on their own personal knowledge. I'm looking, for example, at the affidavit from Ms. Washington. She says, I kept copies of patient records sometimes in my home. That sounds like personal knowledge. Well, we didn't address ñ if you look at the objections, Your Honor ñ I was never disciplined for copying or transporting. In fact, I was told I was going the extra mile. That sounds like personal knowledge. I know that Sandy Wilson, the hygienist, copied patient records with defendant's knowledge and was not disciplined. Well, as to Ms. Wilson, it's unclear how Ms. Markell knows. Well, she doesn't have to say how she knows. She just says, I know. Well, we believe that she needs to say how she knows because otherwise she could have heard from hearsay, and she could have heard it from around the office. We did submit detailed objections to the district court. Those begin at S.E.R. 33. But again, the district court didn't rule on them, so I have a little trouble. If the district court is confronted with objections, the foundation and the like, if you're in a trial, you can move the supplement, you can put the witness on, you can lay foundation. So I think it's unfair for us to sit here and parse the evidentiary problems of this and decide what the district court did. It seems to me we have to deal with the record as we have it that was looked at and decided upon by the district court. So if what you're pointing out are that on their face, whatever their foundational problems may be, if there are the kinds of errors you're talking about or omissions or ambiguities, that's fair game. Well, I think that this court could rule on either. I mean, the district court did rule on the fact that these didn't create, even if you take them at their word, they didn't create a specific issue factor. Don't you have a better argument that the plaintiff was not in the position of these other folks because she had this progressive discipline situation, the straw that broke the camel's back argument? Isn't that your best argument? I don't think it's my best argument, actually, although I think it's a very good argument. I think that the best argument is that none of the information in these declarations, which is, quite frankly, the only issue that plaintiffs raised on this appeal, none of them create any issue of fact as to whether a plaintiff was treated differently. But I do agree with you, Your Honor, that as — Well, no, I'm sorry. If you accept the affidavits, their very precise statement is that she was treated differently with respect to copying and taking home patient records. I disagree, Your Honor. And the reason is because simply copying records is not necessarily a violation of the Kaiser rule. Right. Copying records as part of your job is a violation of the Kaiser rule. Yes. And so tell me more. Okay. Well, there's a number of reasons why these, Ms. Washington and Ms. Holliday, aren't on all fours with Ms. Holliday. But both people are saying, I copied and I took them home. Well, the other point that you have to realize there is that they're not saying when they took them home. Yes, they did. It says it was common practice for hygienists to copy and transport their own, at least in that case, own patients' records between 2003 and 2005. Copying and transporting is different than taking them home because the testimony at the arbitration showed that transport often happened between different offices. For example, the — I kept copies of patient records sometimes in my home, says Ms. Washington. Can you point out a paragraph for me? Yes. It's paragraph 8. It's ER 29. That's paragraph 9. I was never disciplined for copying or transporting records. In fact, I was told by management that I was, quote, going the extra mile, close quote, to do my job. There's so many reasons why this isn't on point with Ms. Markell. Because Ms. Washington does not say when she took them to her home. She doesn't say that any Kaiser manager knew she had taken them to her home. She says she was never disciplined for copying or transporting patient records. Well, wait a minute. She says I was told by management by doing this I was going the extra mile. For copying and transporting patient records, which could be taking a record from one office to another in a patient — Oh, come on, counsel. Let's not — No, Your Honor. I mean, it's plaintiff's responsibility to come forward with evidence to show why Kaiser's legitimate nondiscriminatory reason is a pretext. The more you talk, the more I'm convinced this better go to the jury. Well, I think you're absolutely wrong, Your Honor. I wouldn't be here. But none of this evidence shows that somebody did what Ms. Markell did. And I think that I can help, perhaps, by talking about the reasons that she was disciplined. She was disciplined because her manager knew that she had committed a written policy that already carried termination as a possible consequence, that this exposed Kaiser to liability under HIPAA, so it could only be something that happened from 2003 to 2005, that she violated multiple parts of the policy, including the prohibitions on accessing them, photocopying them, using them for personal reasons, and improperly sort of releasing them into the wild by taking them to her home, that this was a knowing and intentional violation by plaintiff's own admission that it was done for her own personal interest, and that it contradicted the annual training that plaintiff had received. So in order to show that somebody else was treated differently, you have to show that they violated Kaiser policy between 2003 and 2005, that management knew about it, that it was a knowing violation for personal reasons, and that they had the same kind of prior discipline that Ms. Markell had. There are so many points here that these declarations just don't fill in about why these people could have been and probably were different. There's simply nothing here to show that Kaiser treated these other people differently. And that's even if you take the declarations at their word and don't consider the evidentiary objections. And then, even if you get to that point, you reach the other point that the trial court could have ruled in Kaiser's favor on, which is that an arbitration with full and fair adjudication already sat there and listened to all these witnesses and came to conclusions that expressly preclude Ms. Markell from coming forward with evidence on pretext here. So if my time is up, if the Court has no further questions. Okay. Thank you. Thank you, Your Honor. Briefly, Carrie Youngholm terminated Markell. She made the decision. She stated that in copying patient records, Markell engaged in gross misconduct warranting termination. That was what she said. That was the reason. I used the phrase, straw that broke the camel's back, because she had a prior disciplinary record under Angholm. But that was the reason that Angholm gave. In dealing with that reason, the Court below made a false distinction between Markell and the other nurses who copied patient records. He stated, and this is, I think, the heart of the case, Markell conceded that her actions were not motivated in any degree by the purpose of performing her job duties or serving her employer, but were motivated by self-serving reasons. But what she actually said in the arbitration, I copied them so that I could study and look at actual chart documentation to try to improve what I was doing in my charting and try to excel or bring my level of charting to what my supervisor expected. Well, isn't it true, though, that she was under criticism for her charting practices? That's correct. And so why isn't a reasonable inference that she was trying to show the other people are making mistakes? And so why are you getting after me about my charting practices? Other people do the same thing. That's why she wanted to copy the charts, not so she could practice, not so she could say, well, this is the better way to do it, so I'm going to do it like that. But to prove to her supervisors, I'm doing exactly what everybody else is, so get off my back. I'm basing my argument on what she said. I'm not going to speculate about what she could have meant or what she could have been doing. What she said was, I copied them so that I could study and look at actual chart documentation to try to improve what I was doing. That was her testimony. But we've got testimony. What do you deal with? Excuse me, I should say it this way. How do we deal with Ms. Enholm's testimony that your client told her, Ms. I'm sorry, how do we deal with Ms. Enholm's testimony when Ms. Enholm says that your client told her, told Ms. Enholm, they're trying to get me on mistakes, so I'm going to prove that other people are making mistakes in their charting? By drawing all available inferences in the non-moving party's favor. I see. So because this is a summary judgment, we can put this to one side. That's right. I got it. Okay. The other point that I want to make is with regard to the record. Do you agree? Is it true that the charts that she took home included patients who were not hers? Yes. But she wasn't the only one. If you look at the affidavit of Maria Washington. No, I understand. But how is that consistent with her trying to improve? She looked at examples of good charting. I think that probably is entirely consistent with wanting to improve, because if she takes home only her own patients' charts, all she's doing is looking at her own mistakes. Right. I agree with that. Yeah. Okay. I just want to draw your attention briefly to the affidavits. The first one, Maria Washington says, I had ample opportunity to observe the day-to-day contact of dental hygienists who worked at my facility. It was common practice for hygienists to copy and transport their own patient records between 2003 and 2005. Those are the very dates that we're concerned with. But counsel argues that transport is a non-definitive term. It could have been just on campus, basically, between two buildings. I agree that that's unclear, and that's one of the reasons why summary judgment isn't appropriate, and the decision in this case should take place upon a full and fair record. And I just want to point out that Holiday testified in her affidavit, I worked at the Sunset Dental Facility under Carrie Ingholm. She was my last supervisor, and she left in 2005. So the time period for which she's testifying is entirely appropriate. It's coterminous with the time period that we're concerned with here. It's not ambiguous. If there are no other questions, Your Honor, I'll thank you very much. Thank you very much for your argument. The case of Markell v. Kaiser now submitted for decision. The next and last argued case this morning, Kelly v. McCullough.
judges: Jones, Fletcher W. , Fisher